Good afternoon, we have only one case for this afternoon, number 2009-1470, Lucky Litter v. International Trade Commission. Mr. Storm, you may go first. May it please the court, counsel, I will be splitting my time with Eric Cohen, who is a co-respondent with Lucky Litter, and we have allocated the arguments between us subject to courts. Any questions the court may have for us, I'll be dealing with the claim construction of automatic operation position, the validity over Carlisi as anticipation, and non-infringement of the ARPETS product. And what about obviousness over Carlisi? Mr. Cohen will be dealing with the claim construction of comb drive, the obviousness argument, and the Lucky Litter non-infringement. That seems like a difficult way to divide it up, but go ahead and try. I think the anticipation question and the obviousness questions focus on different parts of the claim issues, and that's how we separate them, and obviously we can answer any question that you have. Anyway, if I may proceed. Yes. The first one I would like to address is non-infringement by ARPETS. Claim 33 requires a mode selector switch between a manual operation position and an automatic operation position. I'll be talking about claim construction on that in a second. But regardless of how the claim is construed, there simply is not a switch in ARPETS product that goes between a manual operation position and an automatic operation position. Yours is a button, is that right? You press a button? Yes. Press it down. Yes. Like ringing a bell? The... Until it goes deeper. No, no, no, that's not the issue. The product only has two modes, off and on. And there's no dispute in the evidence about how the product works, and we refer to the state diagram, which was put together by one of our programmers. It's at appendix A-36-7-98. Why is it off the manual position? Because when it's in off, nothing happens. When it's in off, can you manually take the rake structure and move it along and thereby cause manually the removal of the litter? I don't believe you can, but I'm not sure. That wasn't the focus of any of the evidence. The manual position that the commission found was when you push it on, the way the programming works is the first thing in the on mode is it runs a sweep through the litter, removing whatever... It gives you manual operation when you push the button, right? And then the probe, yes, that's what was found, and we're not disputing that part. When it's at off, does it mean it's not operating at all? That's right. The only thing that happens when it's in off mode, there's power to the microprocessor, code is executing, but all it is doing is looking to see whether the button is pressed to move into the on mode. And then it does a sweep, which was found to be a manual operation, and then the program transitions to the cat sensor being active without the switch being involved at all. In contrast... So if it's in the on mode, it is an automatic operation, and you can switch it to manual by pushing the button, right? No, that's the point. That's not the way it works? That's not the way it works. When you push the button on, it does a sweep, that was called a manual. Then it transitions to the cat sensor, that was called automatic. Then it sits there and it stays there indefinitely until you push the button again. You push the button again, it goes off. Well, if you want to operate it in manual, how would you do it? Or can't you do it? There are two ways to do it. You assemble it and you plug it in, and you push the button once, it makes a sweep, and then it transitions to automatic without any further interaction. Or if it's already sitting there with the cat sensor active, you push the button once to turn it off, now it's in off mode, then you push the button again and it restarts the on mode with the sweep going through. And in either case, there's no correlation between the position of the switch and the action of the device, which is what the claim requires. And is there any way somebody looking at the device can tell whether it's on automatic or manual? I see your kitty litter and I come over to it and look at it, can I tell what position it's in? No, you cannot. I cannot. It's just on. Let me speak quickly to the claim construction question, because that's related here, although it doesn't impact the infringement position. With respect to automatic operation position, the commission found that cat sensor was implied in automatic operation position. That is error for two reasons at least. One is that the claim itself defines the term. The claim says automatic operation position, where the cone moves towards the discharge position automatically. What about the absence of the switch in CARLISI? CARLISI has a switch, there's no dispute about that, it's an on-off switch, and the way the text is described, that switch would be... Excuse me, but it's not shown as a manual versus automatic switch in CARLISI, right? It doesn't specifically use the words manual or automatic. Well, it doesn't show it, right? You have to infer it. You have to conclude that it's inherent to have such a switch, right? I believe it's in the text. The text in describing the operation of the switch says an on-off switch is provided for actuation of the cleaning process, alternatively or additionally. So the additionally is in the text of CARLISI, you're not reading something into it, it's there. The process may be started by some predetermined conditions. Yeah, but it speaks about the different modes of operation, but it doesn't describe the switch, right? It doesn't describe the switch beyond off-on switch, that's the text of CARLISI. All right. But it describes two modes, it's happening... And would you then, would you understand CARLISI as disclosing when in the on switch you have cleaning that would be triggered by movement or some other predetermined event, and in the off switch you would have the ability for manual removal where the rake member is moved manually? Yes. Because that's, column three, I would say line 19 to 20 seems to outline that. Right. Is that what you would find as your support for that as well? Right. I'll save the rest of your time, right? I can't agree to with my co-counsel. Thank you. May it please the Court, my name is Eric Kohner, I represent Lucky Litter, and I want to discuss obviousness. Because the only arguable difference between the CARLISI reference and Claim 33 is a mode selector switch. And CARLISI discloses a switch, arguably it's not a mode selector switch. And let's leave aside for the moment the issue of the claim interpretation of automatic operation positions. Let's look at the disclosure of the 847 patent. What does the 847 patent disclose about this switch? The answer is nothing. The switch is disclosed, it says mode selector switch in a block diagram. There is no circuit disclosed for connecting the switch to the microprocessor. So, presumably, one skilled in the art would understand from this disclosure how to make and use an automatic cat litter box with this mode selector switch that has two positions. But the purpose of the switch, isn't it fair to say the purpose of the switch is so that the person who has the box can turn it from manual to automatic or automatic to manual, is that right? In other words, I have the machine and I say, well, today I'm going to use manual, but tomorrow I come in and I say I'll put it on automatic. That's correct, Your Honor. And this switch doesn't do that? The switch, there is nothing in the 847 patent, there are no details disclosed about this switch. CARLISI discloses automatic operation and manual operation. So, how does one change from automatic operation to manual operation? What do you mean there's no details? What about column 7, lines 20 through 26? It talks about, is Your Honor talking about where it's talking about the switch, if the switch is set to manual mode? It does not describe any circuit for connecting the switch to the microprocessor. Well, you don't have to. Why would you have to describe what is obvious to one of the skilled in the art? You're not arguing a written description or an enablement problem. That's my point. CARLISI discloses automatic operation and manual operation, and we put in the record five prior art patents showing it was commonplace in consumer devices to use a switch to change from manual to automatic operation. If you've got manual operation and automatic operation, how are you going to change from one mode to the other except by using a switch? Nobody has suggested otherwise. These are all for other devices, though, aren't they? That's correct, but KSR informs us... They're not related in any way to a cat litter cleaner, are they? They are not, but KSR informs us that we're not restricted to looking at cat litter prior art for this purpose. Common sense tells us that you can use... I don't know what it is, and there's no suggestion as to what it is. In the prosecution history, moving along... Did anyone in the trial testify that there was something unusual about using a manual to automatic switch in connection with this device? There was no testimony. The testimony the plaintiff's focused on was the plain construction argument that the automatic operation position had to be in response to cat exit. Strickland, the patent examiner and prosecution, found that Strickland disclosed the mode selector switch. No expert testified to the contrary. The patent examiner, by recognizing this, this is at least evidence of what one ordinary skill in the art would conclude from reading Strickland, and Strickland discloses response to cat exit. I'd like to reserve the rest of the time. Okay, Mr. Reese. Good afternoon, Your Honor. May it please the Court, my name is Mark Reese, and I represent the United States International Trade Commission, whose determination of violation of Section 337 should be affirmed. Let me focus you on what I think is your main problem. My colleagues may or may not agree with that. Okay. With respect to Claim 33, it seems to me that the Commission may have gotten off track both on the issue of anticipation and obviousness. And take first the cat exit construction. I just don't see how that's consistent with the claim language. They seem to think that the specification somehow could trump the claim language in this respect. But the claim language is pretty clear, and it isn't limited to cat exit. Thank you, Your Honor. That directs me right to that point. I'll go right to it. The construction the Commission gave to automatic operation position, which is what you're talking about, I would submit is the correct construction. The construction is a position of the mode selector switch where combing is initiated in response to cat exit. And as the ALJ found... Yeah, but the problem is that the language of the claim talks about automatically upon the occurrence of a predetermined event. What's the basis for saying that the predetermined event has to be cat exit? Actually, the predetermined event language is entirely consistent with the construction given by the Commission. How so? Well, first of all, the combination of emphasizing the importance of the responsive cleaning feature as well as distinguishing the event over the Carlisi patent expressly as the ALJ held, require that the claim be limited to cat exit. In other words, there are statements you aren't... This isn't importing limitations for those specifications. Now I'm really confused. Because in the reissue application, where claim 33 was added, there was no distinction of the Carlisi patent based on cat exit, was there? In the reissue patent? Yeah. Okay, the specification, Your Honor, applies with equal force to the reissue patent. Answer my question. There was no distinction in the course of the reissue prosecution of Carlisi based on cat exit. It was based on the switch. During the reissue, the... Claim 33 was added in the reissue, right? That's exactly right. Right? And it was initially rejected over Carlisi. Yes, it was. No, no, it was rejected over Carlisi in combination. Combination, it was obvious. And the point that was made in asking that the claim be allowed had nothing to do with cat exit. It had to do with the switch, right? Oh, you're suggesting the patent examiner's statement that he thought there was a switch. The applicant's statement. The applicant's statement, don't reject this over Carlisi and this other reference because this is different, because it has a switch, and Carlisi doesn't have a switch. Your Honor, I think that's not right. What's not right about it? The applicant, it's clear from... I'm looking at the patent here. No, but you said the prosecution history. Judge Dyke is exactly right, and you started with the prosecution history he distinguished over Carlisi, and you focused us on this predetermined language, but you can look at JA 37376 or 37600, and what Judge Dyke is referring to you is it seems that nothing in the prosecution history related to Claim 33 had anything to do with the predetermined event language. There was no cat exit arguments that were made during prosecution relevant to this claim. The only argument made was about the switch. That was the argument during prosecution. So you started us on prosecution by responding to Judge Dyke. It formed a basis for the cat exit limitation being imported into the claim, and I don't see it, and he doesn't see it, and we're hoping since you said it was there, you can shed some light on it, and if you're mistaken, start over. Well, I guess I want to make sure that I'm communicating it clearly. The applicant does not indicate anywhere in the prosecution history that the automatic operation that the automatic operation and the manual operation, that those are a switch. We're not talking about the switch now. We're talking about the mode. We're talking about the language automatically upon the occurrence of a predetermined event. The Commission said the predetermined event has to be cat exit, and Judge Moore and I are asking you why, and in particular, when we issue prosecution, there's no mention of cat exit being used to distinguish Carlisi, right? There is no, I don't, the patent exam, the applicant, in other words, doesn't go out and expressly distinguish every piece of prior art. No, but he, the applicant addressed the obviousness rejection that the examiner made, and in addressing the obviousness rejection, the applicant did not say this is different than Carlisi because it is operational based on cat exit. Your Honor, that was already a given. No, but answer my question. Limit yourself to the reissue prosecution. There's no mention of cat exit being used to distinguish Carlisi, right? In other words, when they get into this debate about is there a switch or not, you're right that there's, when they talk about a switch, yeah, that's exactly right. There was a dispute that the patent examiner thought that the strickland was disclosed, and so therefore he initially, that the switch was disclosed, and so therefore he, in his view, was obvious, and that's why you had the objection, and the proceedings which continued, and he ultimately allowed the claim. I guess my point, and maybe I'm missing it, but it's this. It's that the specification made it very clear, and it's not distinguishing, it's not simply referring to... Yes. A predetermined event, by definition, is broader than cat exit. So the words predetermined event in a vacuum, given an ordinary and customary meaning, would include far more things than cat exit. So to be your own lexicographer, or to import a limitation into the spec, you have to show clear and unmistakable disavowal of the broader scope. That's what our precedent requires. So show us in the specification where it is clear and unmistakable that the predetermined event language in the claim must be narrowly limited to cat exit. Your Honor, at A346, column 1, 46 to 49, there the patent is distinguishing the present invention, not... Okay, I'm sorry. Column 1. Just a description of the preferred embodiment. What line? Lines 46 to 49. So I'd like to walk through some of this language, because I don't see how you can ever square the claim language with this disavowal. I think the disavowal... This is not a disavowal. It doesn't say the invention is limited to this. Okay. And then, Your Honor, I have many more... Where does it say, in the specification, that the invention is limited to a cat exit situation? Your Honor, I think that the very next paragraph, where it talks about the present invention, it has a new and improved drive that is directly responsive to the... Tell me what lines you want, because I'm not following. That's A346, column 1, lines 52... I'm sorry, 59 to 62, Your Honor. It's a principal object of the present invention to provide a new... So it's an object of the invention... Right. ...to provide a new and improved drive for a rake or comb employed to remove litter from a cat box, a drive that is directly responsive to the exit of a cat from a litter box. Now, it says that's an object of the invention, a principal object, but not the only object, and nor does it imply that only cat exit would trigger the thing to move, right? It just says that that's one of the circumstances that would, and it's an object of the invention to create it. I think that the problem you're having is, PsyMed and other cases which created the clear and unmistakable disavow language require more than simply an example, even if that example is replete throughout the specification. It requires limiting language of the sort to suggest that nothing other than this would be appropriate in the definition. If I may respond to that, Your Honor. Don't worry about the time. I'm sorry? Don't worry about the time. Okay, thank you. As long as we have questions, you'll be up there. Yeah, okay. And I appreciate that... Taking a step back, we're dealing with litter boxes here, and the manual operation position, which isn't in dispute, is the activation upon the... Which might not be completely commonsensical if you just came to the case afresh. In other words, manual is not the owner actually scooping out... Well, no, it most certainly can be. There's no reason it can't be the owner scooping out. Why not? You distinguish between manual and automatic, and manual means owner-operated activation, but it doesn't say that can only occur when the owner pushes a button and then the thing automatically scoops. It could just as easily occur by the owner dragging the rake across and dragging it back. How is that any less manual? Your Honor, I'm simply referring to the claim limitation in Claim 33, and I'm just providing context about... There's no dispute. You haven't heard any... Appellants have not contested in this court the construction of manual operation to be human-based input. Okay? So you've got manual operations, human-based input. What other inputs can we have? You can have a cat input, which is what we're talking about here, a cat exit. Well, what else could you have? You could have a timer. Yeah. How time-consuming is it? And so, I mean, that's the universe. If manual operation is human-based input, which no one has even contested here or argued, if that is human-based input, manual operation, then the universe is limited. So this notion of predetermined event must mean, what, acts of God or... What can be a timing function? But the timing function... Here's where I get to your point. I'm trying to get to everyone's point. The timing function is... You can't square that language I would submit under PsyMed, and the case is about clear and unmistakable, that he is disclaiming the timing function. He talks about it in several places, about how it scares the cat. And if you scare the cat... I mean, that's part of what we're dealing with here. Where does he disclaim the timing function? Your Honor, that's exactly what he's referring to in that 146.49. I would submit that's what he's referring to in the 150, column 152, 59.62. That's what he's referring to at 162, column 163. But where does it say that an automatic operation based on timing is disclaimed? Your Honor, I'll take any one of these. Take A346, lines 162 to... Do you have a column number? ...column 22. Column 2? So it actually starts... It's the very last paragraph. It started with the very last paragraph on page A346, column 1. I just have the patent, so I don't have the A whatever. Oh, I'm sorry. Column 2, line what? So it's column 1, line 62, all the way through column 2, line 2. I don't see any statement there that they've disclaimed timing operation. It doesn't operate on a periodical basis. Your Honor, that's what they're referring to with the time system, a periodic system. It's not cat input, it's not human input. It's periodic. It's the timer. It's exactly what Carlisi displays. What do you mean? It works every day at noon? Something like that? Exactly, Your Honor. Exactly. That's what Carlisi talks about. And this inventor said, wait, not only don't I like that, but that's actually a bad thing. You're going to scare cats. It might operate while the cat's in the box. And so that's exactly why... That's a fundamental purpose of what's going on with the 847 patent, is to move away from that Carlisi cat timer system. But you still have a timing system in these inventions, don't you, in that a certain set period of time elapses after the cat leaves the box before it starts the automatic cleaning? Oh, that's the delay feature, Your Honor. Yes, yes. In fact, the interveners say that the automatic operation, that it is cat exit, but it's also cat exit plus a delay. And the commission drew the line there, couldn't find that the claim actually required a delay. The fact that it has a delay after the cat exit doesn't alter the infringement analysis, though. In other words, they both have features, the substantial evidence supports that they both have features indicating this automatic operation position as construed by the commission. Now what about... Let's move for a moment to the commission's other ground for finding that Carlisi didn't anticipate, and that is that Carlisi doesn't have a switch that allows a change between manual and automatic operation. Yes, Your Honor. I mean, there are lots of devices that have that. Why wouldn't it be perfectly obvious to add a switch like that? Well, I get... So do you want me to address the... In other words, whether Carlisi has the mode selector switch? Well, I'd like to address two questions. One, why doesn't it anticipate? Because if it contemplates a change between automatic and manual operation, it must have a switch, so the switch would seem to be inherent. That's question number one. Question number two, even if it doesn't have the switch, switches of this kind are common in these types of devices, so why isn't it obvious to have a switch? Okay, Your Honor. If I... Let me tackle this. I'll try to do it as efficiently as I can. The Carlisi, the commission found, that the appellants didn't demonstrate by clear and convincing evidence that it had two elements, both the automatic operation position and also the switch. And with respect to the switch, Your Honor, the Carlisi... There's no language... The most that Carlisi discloses is an on-off button. There's nothing in Carlisi that indicates... Well, it seems to disclose two modes of operation, manual and automatic. Well, actually, Your Honor, the Carlisi discloses... Actually, I would submit that it's not even exactly clear what it's referring to. Let's assume that it discloses manual and automatic operation. Okay. Isn't a switch inherent in that description? No, Your Honor. Then how else would you move from manual to automatic without a switch? Well, I guess the point is when you say assume it has a manual... In other words, assume it has a position where the switch... where it's a human-based input that causes the machine to go. I'm assuming there are two modes of operation described, one automatic and one manual. And if that's true, isn't it inherent that it has a switch? No, Your Honor. Well, first of all, it doesn't have the automatic operation. I don't care. You have to accept my hypothetical. My hypothetical is we reject your contention about that. We say that Carlisi does disclose both manual and automatic operation as alternatives. Accept that. Isn't it inherent that you have a switch? No, it is not, Your Honor. This is a mode selector switch. In other words, there is a switch. It's an on-off switch that turns the button on. Isn't it inherent that if you have two modes of operation that you have a switch which allows you to choose which one? Not necessarily, Your Honor. Why not? Because when the switch is in the off position, that doesn't necessarily mean that you've turned it to the automated operation position. You could have one, but as the ALJ found, that's not enough under the clear and convincing evidence standard required for anticipation. That's not enough. It's not just any old switch. It's a switch that actually switches between these two functions. And I would submit that that's not disclosed in Carlisi and the burden proof was not met in that case. But again, to pick up on what the diagnosis said, if you've got two different modes of operation and presumably it's the operator who decides which mode he or she wishes to have, there's got to be some mechanism by which the operator could say OK, I want it manual or OK, I now want it automatic. And you have to have something, some sort of switch. I mean, theoretically you could say, well, it's on manual to start with, but if it stays in manual for an hour, then it will go into automatic. Well, then you wouldn't need a switch, but that's not realistic about how a device like this is going to work. I mean, I have to be able, it seems to me, when I'm operating the device to say, OK, now I want it in manual or now I want it in automatic, and there has to be some mechanism by which I can shift from one to the other. Your Honor, both of these devices, what we're dealing with, are these momentary switches. They're passing. In other words, it's just a push, and then the switch comes back to the position. And so I would submit that actually that's not what you have in Carlisi. Well, what do you have?  if you don't have some type of switch? Well, I'm going to what the commission was trying to do was figure out what does Carlisi actually disclose. And what it discloses is this on-off button. There's nothing that suggests or requires, necessitates, that when you put the switch to off, that you're going to trigger the manual operation. Well, you say trigger the manual operation because you seem to be assuming that manual operation has to continue to be somewhat automated. But Carlisi doesn't explain that. Carlisi says at column 3, line 19, the present intervention can be used in a manual fashion where the rake member is moved manually. My understanding of how this works, this disclosure in Carlisi, is you're talking about you can put your hand on top of the rake member and move it manually, sliding it back and forth in order to push the stuff out yourself at your personal whim. Now, that certainly couldn't be done when you were in the on switch with the automated, pre-timed functionality. I mean, that would have to be done when that was off, right? I mean, I don't understand how else this would work. That's the only way I understand the disclosure to explain the process. Well, I think that's another example of where it doesn't clearly show. Well, it does actually clearly show it to me. You're telling me it's not clear, so I'm asking you to show me what I'm missing because it seems to be quite clear. The present intervention can be moved manually by the operator, and that's when it's in the off position. And when it's in the on position, it's going to go on some timed basis. Right, and that's the question. Right, and is that the manual operation that we're talking about in this case? In other words, you're right. It says it refers in that paragraph. It refers to manual with a passive system, not driven. It's human-driven. And then in that paragraph upon which the appellants rely, it refers to an on-off switch is provided for actuation of the cleaning process. That's at column 3, lines 50 and 51. And my point is if you walk through this language, you don't get a mode selector switch. The on-off switch is provided for the actuation. If that is referring to human-based input, in other words, that's how you get the device to cycle once. Well, isn't the problem here a semantic one? That is, we have an on-off button, and the on-off could refer to two different things. It could refer to turning the whole device on and off, or it could also refer to turning on the automatic. And that seems to me is the problem when you just have something that's called an on-off button. What's on-off? Right. Yes, Your Honor. And I think that goes to just the fundamental point that it's ultimately the claim terms that are defined in what the operations are. And the fact that ARPEX characterizes its device as having one mode is frankly irrelevant when you look at what the machine actually does and the fact that you can have both automated and manual operations. You've got a switch. You've got a switch. You've got a switch that's movable. It's physically movable. You're saying the manual operation has to involve the motor. Yes, Your Honor. In the 847 patent, that's what that is, and that's how it can be tested. I'm sorry. Okay, but let's go on to the second question I asked you, and that is, why isn't it perfectly common in devices like this to have a switch which changes from manual to automatic operation, using manual in the sense that you use it? That is, it brings about the raking through the use of the motor. Yes, Your Honor. I guess that's the million-dollar question about obviousness. Why isn't this just like KSR? It is a common thing. Everybody knows about switches that go from manual to automatic operation, so it doesn't make it non-obvious that you've included such a switch. Respectfully, Your Honor, the Commission got it right here. This is one in which it's not simply, I know it sounds clever to characterize it as, well, you just add a switch. Actually, what they're talking about is you look at the sea of automated litter boxes, you decide that the comb drive is the system you want, and that's the best one, then you disclaim a feature of it. I would submit, I think it's a disclaimer, but obviously it's a court's call, a final analysis. I guess so. You then add the element of some cat-based exit, and then you add a switch so that you can choose between them. It's a combination. No, but forget about the combination. The hypothetical I'm asking you is that we don't accept the cat exit construction. We construe this claim as broadly covering any kind of operation, timing, cat exit, or whatever. And the question is, isn't it perfectly obvious to have a switch that allows you to change from manual to automatic operation? Isn't that just like KSR? Your Honor, I'd submit that that is not just like KSR. Why not? The record here is replete with factual evidence regarding the differences in the disclosures and regarding opinion testimony regarding whether you would combine these various elements. And there's nothing that suggests that it would be obvious to combine them. What is the testimony that it wouldn't, if you had different modes of operation, what is the evidence that it wouldn't be obvious to use a switch to change from one to the other? Your Honor, first of all, you've got the examiner who finds that the evidence isn't obvious. What's the testimony? What's the testimony that if you have two different modes of operation, that it would be non-obvious to use a switch to change from one to the other? Well, Dr. Wood, who is the expert for Waters and APLICA here, testified that a person of ordinary skill would not make the leaps necessary to arrive at Claim 33. What is the specific testimony about, you wouldn't use a switch? What I'm quoting from there are A32750 and 51, paragraph 157, and then there are other paragraphs in his testimony. What does he say you wouldn't use a switch? It wouldn't work from a common sense point of view, that's paragraph 146. Skills beyond ordinary engineering expertise would be needed to solve these problems of combining all of these elements that the appellants are suggesting would be obvious. So there isn't any testimony that is addressed to that specific point? No, I think you can fairly read the testimony suggesting that the switch alone is not what makes this patent. Well, that's the exact point. So you agree that the switch alone doesn't make the patent? The switch alone? Yeah. Well, it's a combination of all of these theories. I guess here's what you need to think about. If we were, hypothetically, to conclude that the only thing missing from Carlisi was the switch, if we were to disagree with all of your claim constructions and everything else, then what? The switch seems like a pretty mundane, obvious engineering feat. If you were to disagree, in other words, with... All the claim constructions. Automatic operation. Yep. Everything. Uh-huh. Actually, I think under that circumstance, and I would hope that isn't the case, but in that circumstance, I think actually you're looking at a remand for the commission to determine whether, based on the record in this case... Obviously, this is a question of law. Yes, but Your Honor... All the courts are free to decide questions of law. If the only thing missing from Carlisi, and the only thing I see missing, if I accept their proposed claim constructions, is the switch, is there anything else missing? Because I didn't see anything argued in the record below to be missing from Carlisi under their claim constructions other than the switch. Your Honor, the automated litter boxes is not some predictive field in which you would just reach to add... Because here's my question. Is there anything else missing from Carlisi other than the mode selection switch, if I accept their claim constructions? Okay, in Carlisi... No, Your Honor, as the commission spelled out, he found that it wasn't anticipated because there's neither a mode selection switch disclosed nor automatic operation position. The problem I see, though, is the patent, the claim doesn't just refer to a switch. The claim spells out in considerable detail what the switch is and how it's to operate. It doesn't just... If it had just said, the last part of the claim 33, had just said a switch to connect between the two modes, it doesn't say that. It goes into a great deal of detail about what the switch is, and what its positions are, and how it's connected, and being movable between the two types of operations, and an automatic operation position, and it describes this in considerable detail. This isn't just a simple switch that's set forth in the patent, it's set forth in considerable detail. Yes, Your Honor, I think that's exactly right. And what is the significance of that? Well, the significance of that is... If you look at Claim 27, which refers to automatic operation mode, all the parties agreed below that the automatic operation in 27, Claim 33, it's the same thing. One's the mode, one's the position when you're in that mode. No one suggested that the definition should be... any difference in language between the two claims, 27 and 33. The analysis was the same, and in fact the ALJ applied the same analysis, and the Commission clarified that. In which case, where... No one even asked for a construction of a predetermined event. I mean, that's the level at which you use automatic operation, what does this do? And read in the context of automatic operation, as it is used in the claim, the predetermined event language is entirely consistent with the notion of CAD exit. In other words, whether you're looking at automatic operation, or combing automatically upon the occurrence of a predetermined event... What I don't understand is, if the predetermined operation is limited to, it means only CAD exit, why it was put in those terms rather than in terms of CAD exit? If the only thing that would activate the automatic operation was the CAD exit, one would think that's how the claim would be written, and apparently it was written in that form before the reissue. One of the things they did in the reissue was to change, wasn't it? To change it from CAD exit to predetermined event. Well, 1033 was added, so it was all brand new. In other words, Your Honor, yes. I guess the reissue declarations, I would submit, don't alter that analysis. They're consistent with that analysis, insofar as one is talking about the reissue declarations. Do you have anything more? No, sorry. Do you want me to stop, Your Honor? I think that's sufficient. Thank you. Okay, thank you, Your Honor. We'll hear from Mr. Mills. Good morning, or good afternoon, Your Honor. May it please the Court, I'm Jeff Mills, representing Intervenors, APICA, Consumer Products, and Waters Research Company. Your Honor, I'd like to start off. You asked a question about the switch and whether the claim is obvious if you change automatic operation position claim construction. I would say that this case is different from KSR in a number of respects. First of all, the PTO actually considered the references. In KSR, that was not the case. The sign of the main reference that was used was not before the Patent Office, for the Patent Office to consider. Second of all, there is no evidence of any reason to combine common sense or otherwise. They simply didn't put any in in this case. They just assumed that KSR got rid of any TSM test whatsoever. And, in fact, in KSR, you may recall, Your Honor, in the wires case that you just authored, that Rickson specifically said why you should move the sensor to get rid of the wire chafing problems. And then third, there is no evidence that the Carlisi device, if you added anything to it, frankly, Carlisi of itself, and then combining with anything in the prior art, would work for its intended purpose. In the Martin v. Alliance Machine Systems case that was recently decided by this Court, August 20th, the statement is made to be clear. Prior art must teach a person of ordinary skill to make an apparatus that works for its intended purpose. If the busy machine did not do so, Alliance would have needed to establish that a person of ordinary skill would have nonetheless been able to make a working apparatus. Here, we're talking about a working self-cleaning litter box that actually works with cats. The evidence in this case is all on one side, and that is it was incredibly difficult to make any device to work with cats. In fact, there's no evidence of any device that was working and introduced that wasn't first tested with cats. Mr. Waters, when he tried to do his particular device, failed when he first tested it with cats, and had lots of different problems. Lucky Litter says when they tested the device, they learned something, and what did they learn? They spent over a year with the device. Got it to testing with cats. Counsel, is there anything missing from Carlisi other than a mode selector switch, if we were to agree with their limitation of predetermined event? No, Your Honor. So why is a mode selector switch, in light of the disclosure of a manual and an automatic mode, two separate modes, why isn't that at a minimum obvious such that an ordinary mechanic and certainly someone skilled in this art would be able to add it to the reference? My answer to that is we still need to know that we've got a self-cleaning litter box that works for its intended purpose. It's not just the mode select switch. It is the invention as a whole of Section 103 says. Self-cleaning litter box that has these features, including a mode selector switch. You said the only thing missing from Carlisi is the switch. We know we have two different modes of operation presented in Carlisi. Why isn't it obvious to put a switch there to enable the two different modes of operation? Well, because, Your Honor, we're not seeing that... Well, first of all, there's no reason, no evidence to do that, reason to do that, to modify Carlisi in that manner. It just simply wasn't put in... If you have two different modes of operation, you've got to be able to move from one to the other. Why isn't a switch an obvious way of doing it? It's either a switch, or you pull the plug out of the wall, right? Take the batteries out. I mean, there's got to be some way to get between manual and automatic. And, Your Honor, there's no evidence on the number of different options that were out there for doing that. I mean, there may well have been several. Tell us about one. Well, pulling the plug was just... Let's assume manual operation means motorized operation. You can't pull the plug and have the motor work. Well, how do you get between manual and... Automatic. ...without a switch? Well, you implement another mode of operation completely separate. What's that mean? That means I were to... For instance, in Carlisi, I would put a timer on, and it's complete separate. It's a separate mode of operation, entirely independent of... Well, how do you get from one mode of operation to the other? How do I get from one mode of operation to the other? In that case, human selection. I mean, for instance, the timer could simply be on a... I'm not setting any switch. I'm just putting it on 30 minutes. How do you do it? How do I do it? Yeah. By setting the time, 30 minutes. You know how you have those little turning knobs on... That's not a switch. Huh? It's not a switch? I don't believe there's any testimony... I don't believe that's a switch. And I don't believe there's any testimony on the record on that. But Carlisi actually discloses an on-off switch. It discloses a switch that turns it on and off with regard to cleaning actuation and the mechanized process. So why isn't that the mode selection switch? Because it's off when the mode select... when the switch is in the other position. It's not selecting the other mode of operations, it's just turning the motor off. But why isn't turning the motor off so that you can manually rake the litter yourself, which is actually disclosed in the Carlisi reference? Why does it matter that the patent that your company has discloses a mechanized manual cleaning versus a human-driven manual cleaning that may be disclosed by Carlisi? Well, that's the only thing that was disclosed in the specifications. But the claims don't require that. The claims simply require manual versus automatic, and they don't ever say manual has to be automated. Well, I guess I would answer that... Manual has to be automated, right? I'm sorry. Go ahead. I guess I would answer that I read the claim construction that was adopted and not challenged as requiring the human-based for initiating a cleaning operation, and I think I read that as being motorized. You're right. No, but that's exactly it. How could you read it as being motorized? The word motorized does not appear in the claim construction. Manual operation is human-initiated. It never says that human-initiated therefore causes a motorized system to clean. It says human-initiated. So accepting the lower court's construction and the claim language here, there's no disclosure that manual operation must be motorized. So I don't see why Carlisi doesn't disclose it in light of that. I understand. Human-based... I guess I would say a human-based input. I guess I don't read manual raking as a human-based input that initiates. I mean, to me, that's the entire raking that's not initiated. I think the court requires initiation. The other, if I may, Your Honor, I would like to also point out just briefly that claims 2741 and 42 do not have the automatic operation position issue that you have raised. They have been interpreted to be very specific to the figure 7 embodiment that includes both the automatic operation in response to CAD exit and a CAD absence delay that's right there in figure 7. That element was found to be met. The infringement of those claims by Lucky Leder on claims 2741 and 42, well, there's no disclosure in any of the prior art, no evidence from the standpoint of obviousness that any figure 7 algorithm is in any of these. Remind me, I might have misunderstood or I might not be recollecting correctly. Did the commission hold that 2741 and 42 were infringed or not infringed? Not infringed because of the comb-derived means limitation, and that's what I was going to get at. I've got the comb-derived means specification language. That's the only limitation that was found to be not infringed, and we believe if you look at the comb-derived means sentence in the specification by itself, first of all, in comb-derived in general, the commission interpreted the comb-derived language to refer to the mechanism necessary for deriving the comb, that's the motor and gear train. So under this court's precedent, when you're looking at means plus function, section 112.6, and determining the corresponding structure for the comb-derived means with the function being deriving the comb between point A and point B, it's the structure necessary. You say that they included too much structure. They included too much structure, Your Honor, and we think even the specification sentence that they're talking about, that they relied on, column 3, lines 31 and 36, for three different reasons, really actually describes the motor and gear train as the structure that's doing the deriving. I think that's all covered in your brief. You're well out of time. I'm sorry. Thank you very much. Thank you. I have a few remarks, not many. The first remark on the constructive automatic operation position is that the inventor is... Do you agree that manual operation requires motorized operation? I think from the claim construction, it may not. Well, did you ever argue that, that it didn't? We did not argue that. We assume in our arguments that it required motorized operation, but I think as broadly as it's been construed, it may not. With respect to the inventor's oath, the inventor specifically said, and I think this is worth repeating, that I believe that the original patent is wholly or partly inoperative because Claim 1 contains recitations regarding a cat-exit sensor delay means, which are too limiting of the invention and unnecessary in view of the prior art. Are you the appropriate person to address the comb drive means? Yes, I am. Do you mind if I move you on to that? Sure. So why didn't the ITC adopt too much structure? This is a means plus function language claim, and as Mr. Mills explained, the specification, as we all know, is the source of what the structure ought to be. The specification describes the comb drive as follows. It says it includes a comb drive that comprises a reversible electric motor mounted on and connected in driver relationship to the shaft that supports the comb. The final gear of the gear train that connects motor and shaft is the only gear that's shown in the drawings. So it is actually defined here as a, it says a comb drive that comprises a reversible electric motor mounted on and connected in driving relationship to the shaft. And this is how they distinguish. Because if there's anything inventive about their litter box, it's this drive mechanism they have that's different from Carlisi. Carlisi uses a worm drive. He's got a worm gear, and then he's got like a long screw along the side, and so you've got basically two worm drives, so to speak, or two worm gears. In this particular pattern, the only embodiment disclosed is the comb drive. You've got an electric motor that's mounted on in driver relationship with the shaft that goes across the litter box. The shaft supports the comb. At the ends of the shafts are these cog wheels, and it's sort of like a tractor drive, so it makes almost like the kind we used to see on dot matrix printers. And so that's how it works. So we think here that it specifically says it's the motor that's connected in driver relationship to the shaft. That's specifically how it's described here. The motor and gears have to be connected to something in order to drive the comb. So we think that the commission's interpretation was absolutely correct. Okay. Thank you. Unless you have some questions for me about the operation of Arquette's product, I believe everything's been covered. I'm happy to talk, but... I think that's fine. Thank you very much. Always good to surrender your extra time. I know it's hard for a lawyer to set up, but I'm going to try. Okay. And I think all counsel has been very helpful, and our session is concluded. Case is submitted. All rise. The court is now adjourned from day to day. Thank you. You're welcome. How are you?